## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**WILLIAM A. HELLMAN,**

        **Plaintiff,**

                                    **Civil Action 2:11-cv-1138**

      **v.**                            **Judge George C. Smith**

                                    **Magistrate Judge Elizabeth P. Deavers**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, William A. Hellman, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 16), the Commissioner's Memorandum in Opposition (ECF No. 17), and the administrative record (ECF No. 9). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

# I.   BACKGROUND

Plaintiff Hellman filed his applications for benefits on July 10, 2007, alleging that he has been disabled since April 1, 1999, at age 45.  (R. at 117-19, 120-26.)[1]  Plaintiff alleges disability as a result of rheumatoid arthritis, degenerative joint disease, asthma, Graves diseases, and depression.  (R. at 137.)  The Social Security Administration denied Plaintiff's application initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge John R. Allen ("ALJ") held a hearing on February 19, 2010, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 41-62.)  Vocational expert Michael A. Klein, Ph.D. ("VE") also appeared and testified at the hearing.  (R. at 63-67.)  On April 22, 2010, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 9-27.)  On October 26, 2011, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-4.)  Plaintiff then timely commenced the instant action.

## II.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff testified that he lives in the basement of his brother's home.  (R. at 41.)  Although his disabled mother lives upstairs, just ten feet from his door, he does not visit her.  (R. at 55.)  He has earned a high school equivalence diploma.  (R. at 41-42.)  Plaintiff testified he was a "house husband" until his wife died in 1999.  (R. at 42.)  He then he worked briefly doing

---

[1]Plaintiff originally filed applications for both supplemental security income and disability insurance benefits.  He does not, however, have insured status after April 1, 1999.  (R. at 127.)

heating and air conditioning work.  (*Id.*)  Plaintiff indicates that he subsequently earned two certifications through the EPA so that he could be a technician, but that he was unable to utilize them because of an injury he sustained.  (R. at 43.)

Plaintiff testified he cannot work because of daily pain, depression, and anxiety.  (R. at 43.)  He also represented that he has "a fear of going outside most of the time."  (*Id.*)  He added that it was hard for him to be at the hearing.  (*Id.*)  Plaintiff also testified that he suffers from an anti-social disorder. (R. at 50.)  He explained that, for the past couple of years, he does not like to be around people and reported that he sometimes will "sit and cry at the drop of a hat."  (R. at 50, 57-58.)  He reported going to therapy and taking medications for his mental impairments. (R. at 51.)  Plaintiff testified that although he continues to see a psychiatrist for medication, he is was not currently treating with a counselor because his regular counselor left, and he has been unable to find one that he trusts to talk to.  (R. at 50–51.)  He testified that being in prison for six years negatively affected his mental health, but that he expects to recover.  (R. at 61.)

Plaintiff indicated that he used to paint and go fishing about a year and a half prior to the hearing.  He testified that he now spends his days in the basement watching television and occasionally reading.  (R. at 52-53.)  He microwaves his meals.  (R. at 53.)  He does his own grocery shopping but frequently falls down when trying to carry his groceries down the stairs. (R. at 53-54.)  Because he does not like to be around people, he goes to Wal-mart at 2:30 a.m., when only the stock people are there.  (R. at 57.)  People invite him to socialize, but he does not like to go out.  (R. at 58.)  He reports driving at least once a daily, if only to get his mail, explaining as follows:  "if you're in a basement with no light, you have to try to get out, and I drive to the mailbox."  (R. at 44.)

3

**B.** **Vocational Expert Testimony**

Michael Klein, Ph.D., testified as the vocational expert ("VE") at the administrative hearing.  (R. at 63-67.)  The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity to the VE.  The ALJ first asked the VE to consider an individual of Plaintiff's age, past work experience, and education, who is limited to lifting ten pounds frequently and twenty pounds occasionally; can sit for only six hours in an eight hour day; can stand or walk for only two hours in an eight hour day; occasionally use stairs, stoop, kneel, crouch, and crawl; could not use ladders; could perform a full range of unskilled work, but would be limited to interaction with co-workers and supervisors for questions and instructions, but generally should work alone; would be limited to contact with the general public for about ten percent of the workday; and could accommodate occasional changes in work setting or assignment.  (R. at 64.)  Based upon this hypothetical, the VE acknowledged that Plaintiff could not perform his past relevant work, but that other sedentary, unskilled jobs would be available at the state and national levels.  Representative jobs included sorter/packer, assembler, and sorter.  (R. at 65-66.)

The VE was next asked to assume the mental limitations set forth in Ms. Morris' and Dr. Hayes' mental functional capacity assessment.[2]  (R. at 66.)  The VE testified that based on the number of marked limitations in areas essential for work, there is no work Plaintiff could perform.  (*Id.*)  The VE also testified that he believed his testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (R. at 66-67.)

---

[2]These assessments are discussed *infra*.

4

## III.    MEDICAL RECORDS[3]

### A.    Gary S. Sarver, Ph.D.

On September 26, 2007, Dr. Sarver examined Plaintiff on behalf of the Bureau of Disability Determination ("BDD").  (R. at 314-19.)  Plaintiff reported subjective depression he attributed to his criminal conviction.  He indicated that he likes to be by himself because of his parole conditions.  Plaintiff also reported that he worries most about "going back to prison."  (R. at 315.)  Plaintiff reported no history of suicide attempt, but indicated that he had low lethality suicidal ideation in the past.  (*Id.*)  Plaintiff also reported being angry five days a week and crying four days a week because of probation rules.  (*Id.*)  He indicated that he cooked, did dishes and laundry, went shopping and paid bills, and enjoyed painting as a hobby.  (*Id.*)  Plaintiff opined that he could not work, because "of [his] joint disease and [because he is] a sexual predator, no one will hire [him]."  (R. at 317.)

Dr. Sarver estimated Plaintiff's commonsense and judgment to be in the low-average range.  He observed "no obvious distress"; "no emotional lability"; no "motoric indications of depression or anxiety"; and "no difficulty . . . with attentional pace or persistence."  (R. at 316.)  Dr. Sarver described Plaintiff as "generally cooperative" and "alert."  (*Id.*)  He described Plaintiff's affect as "broodingly resentful within normal limits in terms of range and appropriateness."  (*Id.*)  He found Plaintiff's orientation, memory registration, short-term memory, attention, and long-term memory to be functionally intact.  (R. at 316–17.)  He assessed

---

[3]In addition to mental impairments, the Undersigned recognizes that Plaintiff alleges disability, in part, because of his physical impairments.  Plaintiff's Statement of Errors, however, focuses primarily on the ALJ's consideration and treatment of his alleged mental impairments and limitations. Accordingly, the Court will focus its review of the medical evidence on Plaintiff's mental impairments and limitations.

5

Plaintiff's abstract reasoning as within the average range and his commonsense/judgment as within the low-average range. (R. at 317.)

Dr. Sarver diagnosed Plaintiff with a depressive disorder not otherwise specified and anti-social personality disorder. He assigned Plaintiff Global Assessment of Functioning ("GAF") score of 50.[4] (R. at 318.) Dr. Sarver opined that Plaintiff's ability to relate to others was markedly limited secondary to his personality disorder. (R. at 318.) He further opined that Plaintiff's ability to manage daily work stresses was moderately limited secondary to his personality disorder and poorly developed ego skills. Dr. Sarver added that Plaintiff is "likely to have difficulty organizing, structuring, and working toward goals" and also "containing his anger, managing his frustration, and controlling his impulses." (*Id*.) He found no limitations concerning Plaintiff's ability to understand and follow simple job instructions or to maintain attention, pace, or persistence. (*Id*.)

**B.** **Steven J. Meyer, Ph.D.**

On October 19, 2007, after review of Plaintiff's medical record, Dr. Meyer, a state-agency psychologist, assessed his mental condition. (R. at 321-39.) Dr. Meyer found Plaintiff had mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties maintaining concentration, persistence or pace; and no episodes of decompensation. (R. at 335.) Dr. Meyer also concluded that the evidence did not establish the

---

[4]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34 ("DSM-IV-TR"). A GAF score of 41-50 is indicative of an individual having "serious symptoms . . . or serious impairment in occupational, social, or school functioning" *Id.* at 34.

6

presence of the "Part C" criteria.  (R. at 336.)  He found Plaintiff's allegations to be only

partially credible, noting specifically that the recent medical records did not support a diagnosis

of depression.  (R. at 336.)  Dr. Meyer noted his disagreement with Dr. Sarver's finding of

marked limitations in ability to relate to supervisors, noting that the medical evidence does not

support such limitation.  In further support of his disagreement, he referenced Plaintiff's prison

records and noted the absence of any history of difficulty in interacting with the other prisoners,

prison guards, and doctors.  (*Id.*)  In the narrative assessment of Plaintiff's ability to engage in

work-related activities from a mental standpoint, Dr. Meyer concluded that Plaintiff is able to

understand and remember simple and complex instructions; he is able to maintain attention

sufficiently to complete simple as well as more detailed tasks; and he is able to get along with

coworkers and supervisors in at least a superficial manner, with few changes.  (R. at 323.)  Dr.

Meyer added that a nonpublic setting with reduced social demands would be preferable.  (*Id.*)  In

March 2008, state-agency psychologist Karen Stailey-Steiger, Ph.D., reviewed the file and

affirmed Dr. Meyer's assessment.  (R. at 403.)

     **C.**    **Alan White, Ph.D.**

    On February 18, 2008, Dr. White evaluated Plaintiff on behalf of the BDD.  (R. at

379-84.)  Plaintiff admitted that he raped his step-daughter and spent six years in prison and is

now labeled a sexual predator.  (R. at 380.)  He reported problems with people in his community,

including public officials, store clerks, and his neighbors.  (*Id.*)  He endorsed feelings of

depression, suicide, and anger and stated that he was unable to hold a job due to knee and back

pain and depression.  (R. at 381.)  He reported fatigue, recent change in appetite and eating

habits, weight gain, feelings of worthlessness, guilt, helplessness and hopelessness, and loss of

interest in previously pleasing activities or simple things such as his personal appearance or cleanliness of his home.  Plaintiff also reported crying spells, self-isolation, and irritability.  He indicated that he got into arguments frequently and felt impulsive with little regard to any consequences.  Plaintiff described feeling tense and uptight and having problems concentrating or remembering things.  He complained of difficulty with making day-to-day decisions.  He also reported that he has an unusual fear of being outside or around people, but is able to leave his home and go to public places.  He reported a history of suicidal ideation with no attempts.  Plaintiff denied any prior use of psychiatric medications or of any mental health counseling.

Dr. White described Plaintiff as casually dressed with adequate hygiene.  He noted that Plaintiff was cooperative, alert, smiling, and displaying direct eye contact.  Beyond Plaintiff's self-report of subjective symptoms, Dr. White did not clinically observe symptoms of depression or any overt signs of anxiety.  (R. at 381.)  Dr. White diagnosed depressive disorder not otherwise specified, explaining that the symptoms Plaintiff reported did not meet the criteria for a specific depressive disorder.  (R. at 383.)  He also diagnosed anti-social personality disorder and assigned Plaintiff a GAF score of 50.  Dr. White opined that Plaintiff's abilities to relate to others is moderately impaired due to his personality disorder.  (*Id.*)  He further opined that Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activity is moderately impaired due to depression.  (*Id*.)  Dr. White found no impairment relating to Plaintiff's ability to understand, remember, and follow instructions or to maintain attention, concentration, persistence, and pace to perform routine tasks.  (*Id.*)

8

### D.    Tri-County Mental Health & Counseling Service

Plaintiff was initially evaluated by Sabrina Morris, PCC-S on February 28, 2008.  (R. at 373-75.)  He reported that he was seeking Social Security benefits due to his physical and psychiatric impairments.  (R. at 373.)  Plaintiff reported that he had experienced symptoms of mental illness his entire life and had tried to jump off a building.  (R. at 374.)  Ms. Morris noted that Plaintiff presented much older than his chronological age and that he was disheveled and odiferous.  She found Plaintiff to be an accurate historian, noting he had much psychomotor rigidity and slowing.  He reported regular suicidal ideation with no plan or intent.  Ms. Morris described him as tearful and cooperative.  She found his judgment and insight to be fair.  She noted that his short-term memory and concentration seemed to be impaired.  She further noted that Plaintiff endorsed numerous depressive symptoms including increased sadness and crying; decreased ability to sleep; decreased appetite; anhedonia, loss of energy; inability to carry out daily tasks; thoughts of worthless and hopelessness: suicide ideation; and recurrent thoughts of death.  Ms. Morris diagnosed Plaintiff with a major depressive disorder, recurrent, moderate; sexual abuse of child per history; anti-social personality disorder; and pain disorder associated with a general medical condition.  She assigned him a GAF score of 30.[5]  (R. at 375.)

That same day, Ms. Morris and Terry Hayes, Ph.D., her supervising psychologist, completed a mental functional capacity assessment for the Vinton County Department of Job and Family Services.  (R. at 372.)  They opined that Plaintiff was markedly limited in his ability to

---

[5]A GAF score of 21 to 30 is reflective of an individual that is "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriate, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home or friends)."  DSM-IV-TR at 32.

understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently of others.  They further opined that Plaintiff was moderately limited in his abilities to remember locations and work-like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to make simple work-related decisions; to ask simple questions or request assistance; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation.  They concluded Plaintiff was unemployable and unable to work for twelve months or more.  (*Id.*)

Plaintiff began treating with psychiatrist, William Resch, M.D., on August 19, 2008, on referral from Ms. Morris for concerns of depression and medication.  (R. 431-36.)  Plaintiff complained of depression that he reported experiencing for at least eight years.  He reported that he is chronically sad, cries frequently, has marked anhedonia, sleep disturbances, irritability, and chronic thoughts of wishing he were dead.  (R. at 431.)  Plaintiff reported having three prior

psychiatric hospitalizations.  Plaintiff also reported that he lived a very withdrawn lifestyle and had few friends or close confidants.  He indicated that constantly worries about his future and lack of income.  Dr. Resch noted Plaintiff displayed the defense mechanisms of smiling and laughing.  Dr. Resch diagnosed major depressive disorder, recurrent and moderate, as well as anxiety not otherwise specified, mostly situational and secondary to his major depressive disorder; and an anti-social personality disorder based on his history.  He assigned Plaintiff a GAF score of 55.  (R. at 435.)  Dr. Resch recommended starting Plaintiff on an antidepressant trial and continuing therapy with Ms. Morris.  (R. at 436.)

Dr. Resch prescribed a different medication on October 19, 2008, due to Plaintiff's reports of thoughts of hurting himself and feeling more depressed.  (R. at 428-29.)  On December 23, 2008, Plaintiff reported that the medicine "worked the complete opposite for [him]."  (R. at 426.)  Dr. Resch noted that Plaintiff's symptoms remained unchanged with "a lot of anger and mood disturbance."  (*Id.*)

On September 9, 2009, Plaintiff began treating with psychiatrist Robert Wyatt, M.D. Plaintiff told Dr. Wyatt that he was last seen in February 2009 and that he had tried and discontinued several different medications because of adverse side effects and "lack of efficiency."  (R. at 490.)  He complained of depressed mood and frequent teariness.  He described daily ups and downs and chronic suicidal ideation without plan or intent.  He reported increased appetite and decreased energy.  Dr. Wyatt noted that Plaintiff's presentation was "somewhat confusing" because his appearance and behavior did not match his complaints.  (R. at 491.)  He noted that while Plaintiff complained of feeling "terribly depressed," he displayed an "incongruent euthymic jovial affect."  (*Id.*)  Notwithstanding these observations, Dr. Wyatt

11

continued Plaintiff's prior diagnoses, but noted the potential alternative diagnoses of bipolar

disorder, personality disorder, and drug seeking.  (*Id.*)  On October 29, 2009, and December 16,

2009, Dr. Wyatt continued Plaintiff's diagnoses of major depressive disorder, recurrent; anxiety

not otherwise specified; and anti-social personality disorder, but again noted that he observed

"continued incongruency between [Plaintiff's complaints] and appearance."  (R. at 489.)  On

December 16, 2009, he also noted that Plaintiff reported improved mood and anxiety control.

(R. at 486.)

## V.  THE ADMINISTRATIVE DECISION

On April 22, 2010, the ALJ issued his decision.  (R. at 9-27.)  At step one of the

sequential evaluation process,[6] the ALJ found that Plaintiff had not engaged in substantially

gainful activity since July 10, 2007.  (R. at 11.)  The ALJ found that Plaintiff had the severe

impairments "best described" as degenerative disc disease of the lumbar spine, bilateral

---

[6] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

degenerative joint disease of the knees, and personality disorder.  (*Id.*)  He further found that

Plaintiff did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(R. at 14.)  At step four of the sequential process, the ALJ evaluated Plaintiff's residual

functional capacity ("RFC").  The ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform a limited range of light work as defined in 20
> CFR 416.967(b).  Specifically, he can lift and/or carry ten pounds frequently and
> twenty pounds occasionally.  He can stand and/or walk a total of at least two hours
> in an eight-hour workday and sit for a total of about six hours in an eight-hour
> workday.  His ability to push and/or pull objects, including operation of hand and/or
> foot controls is not restricted.  While he cannot climb ladders, ropes or scaffolds, he
> can climb ramps and stairs occasionally.  He can occasionally stoop, kneel, crouch
> and crawl as well.  He has no restriction  in his ability to perform fine and gross
> manipulation and can reach in all directions, including overhead without limitation.
> He  does not have any visual, com   municative  or environm ental  limitations.
> Additionally, the claimant can do a full range of unskilled work.  He can interact
> with coworkers and supervisors to ask questions or receive instructions and interact
> with  only ten percent of an eight-hour    workday  with the general publi c.  The
> claimant  is able to be in contact with the general public f     or ten percent of  an
> eight-hour  workday and can tolerate occasional     changes in a work setting or
> assignment.

(R. at 18.)  In reaching this determination, the ALJ adopted the opinions of Dr. Meyer, asserting

that he is "well qualified by reason of training and experience in reviewing an objective record

and formulating an opinion as to limitations."  (R. at 18.)  The ALJ also found Dr. Meyer's

assessment to be an accurate reflection of Plaintiff's mental status and "consistent with and well

supported by the evidence of the record as a whole."  (*Id.*)  The ALJ concluded that a careful

review of the record does not document sufficient objective medical evidence to substantiate the

severity of the pain and degree of functional limitations Plaintiff alleged.  (R. at 21.)

13

Relying on the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the state and national economy that Plaintiff can perform. (R. at 25-26.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 27.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the

14

Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.    ANALYSIS

In his Statement of Errors, Plaintiff asserts that the ALJ erred in finding that his only severe mental disorder is a personality disorder and that his only resulting mental limitations allowed for a full range of unskilled work with reduced interaction with supervisors, co-workers and the public and the ability to tolerate only occasional changes in a work setting or assignment. Plaintiff maintains that the medical evidence establishes that he suffers from severe depressive disorder as well as anxiety.  He also posits that the assignment of a GAF score of 50 "is proof of the severity of the depressive impairment."  Although Plaintiff submits that the ALJ should have adopted "more extensive limitations," he neglects to specify what limitations he thought should be incorporated.

The Undersigned finds that the ALJ did not commit reversible error in omitting depression from his step-two listing of severe impairments.  Where the ALJ determines that a claimant had a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, No. 02-2335, 73 F. App'x 801, 803, (6th Cir. Aug. 11, 2003). Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity."  20 C.F.R. § 404.1545(e); *Pompa*, 73 F. A'ppx at 803 (rejecting

15

the claimant's argument that the ALJ erred by finding that a number of her impairments were not

severe where the ALJ determined that claimant had at least one severe impairment and

considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec. of Health

& Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).  Here, after concluding that Plaintiff

had the severe mental impairment "best described" as personality disorder, the ALJ proceeded to

consider the record evidence to determine the limiting effects if his mental impairments on his

activities of daily living, social functioning, and concentration, persistence, and pace for

purposes of formulating his RFC.  In doing so, the ALJ offered reasonable explanations for his

rejection of limitations more severe than he incorporated into the RFC.

  Regardless, the ALJ offered good reasons for his step-two and step-five findings, and his

stated reasons are supported by substantial evidence.  Specifically, the ALJ adopted Dr. Meyer's

assessment, noting that it was consistent with and well-supported by the record as a whole and

reflected an accurate representation of Plaintiff's mental status.  (R. at 18.)  The ALJ further

concluded that the record evidence he received after Dr. Stailey-Steiger's reconsideration

determination "did not provide any credible or objectively supported new and material

information" that would alter Drs. Meyer and Stailey-Steiger's findings.  (*Id*.)  Drs. Meyer and

Stailey-Steiger opined that Plaintiff was only partially credible and specifically concluded that

the medical record did not support the diagnoses of depression.  (R. at 323.)  Dr. Meyer

referenced Plaintiff's documented history of malingering in support of his opinion.  (*Id*.)  The

ALJ likewise found Plaintiff to lack credibility, a determination he does not challenge here.

  Further, in connection with his adoption of Dr. Meyer's assessment and formulation of

Plaintiff's RFC, the ALJ advanced good reasons for declining to credit the opinions of other

medical sources insofar as their opinions were inconsistent with his findings.  For example, the

ALJ rejected Drs. Sarver's finding of more severe limitations as unsupported by objective

medical evidence and because he relied, in part, on Plaintiff's subjective allegations, which the

ALJ concluded lacked credibility.[7]  (R. at 19.)  Consistent with the ALJ's stated reasons, Dr.

Sarver's report reveals that he observed "no obvious distress"; "no emotional lability"; and no

"motoric indications of depression or anxiety"; and "no difficulty . . . with attentional pace or

persistence."  (R. at 316.)  Similarly, the evaluation and treatment notes of Drs. White, Resh, and

Wyatt reflect that they, too, relied upon Plaintiff's subjective allegations.  Dr. White's notes

reflect that Plaintiff was alert and smiling with a generalized affect.  (R. at 381.)  He explicitly

noted that Plaintiff "did not display over signs of anxiety" and that he relied upon Plaintiff's

reported symptoms to arrive at his diagnosis of depressive disorder, not otherwise specified.  (R.

at 381, 383.)  In September 2009, Dr. Wyatt described Plaintiff's presentation as "somewhat

confusing," explaining that his appearance and behavior did not match his complaints.  (R. at

491.)  He further explained that while Plaintiff complained of feeling "terribly depressed," he

displayed an "incongruent euthymic jovial affect."  (*Id.*)  In December 2009, Dr. Wyatt again

noted Plaintiff's "continued incongruency between [his complaints] and appearance."  (R. at

489.)  The ALJ similarly rejected Ms. Morris' and Dr. Hayes' mental functional capacity

assessment as inconsistent with and unsupported by the record evidence.  He pointed out that it

appeared that Ms. Morris based her opinions on Plaintiff's subjective complaints and that she did

-----

[7]Notably, Dr. Sarver expressly attributed each of the limitations he opined to Plaintiff's
personality disorder.  Thus, Dr. Sarver's opinion does not support Plaintiff's contention that the
ALJ erred in failing to incorporate more restrictive limitations into his RFC to account for
limitations resulting from depression.

not have access to all of the medical evidence in the record.  The ALJ also pointed out that her conclusions did not constitute a specific assessment of the nature and severity of Plaintiff's impairments.  (R. at 19–20.)

Finally, the Plaintiff's contention that the GAF score Drs. Sarver and White assigned him proves the severity of his depressive condition lacks merit for a number of reasons.  First, a GAF score represents a "snapshot" of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Commissioner*, 61 F. App'x 191, 194 n. 2 (6th Cir. 2003); *see also* DSM-IV-TR at 32–34.  "As such, a GAF assessment is isolated to a relatively brief period of time, rather than being significantly probative of a person's ability to perform mental work activities on a full-time basis."  *Arnold v. Astrue*, No. 10-cv-13, 2010 WL 5812957, at *8 (S.D. Ohio Oct. 7, 2010).  Further, "the Commissioner has declined to endorse the GAF score for use in the Social Security and SSI disability programs, and has indicated that GAF scores have no direct correlation to the severity requirements of the mental disorders listings."  *Kennedy v. Astrue,* 247 F. App'x 761, 766 (6th Cir. 2007) (internal quotation marks and citations omitted).  Regardless, as set forth above, the ALJ provided good reasons for not crediting these doctors' assessments to the extent they conflicted with his stated RFC.

In sum, the Undersigned finds no error in the ALJ's consideration and evaluation of the record evidence.  The Undersigned further finds that the ALJ's finding of nondisability is based on his consideration of the entire record and is supported by substantial evidence.

## VIII.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that

substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM**

the Commissioner of Social Security's decision.

## IX.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that

party may, within fourteen (14) days, file and serve on all parties objections to the Report and

Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation). Even when timely objections are filed, appellate

review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  February 13, 2013
          /s/ *Elizabeth A. Preston Deavers*
           Elizabeth A. Preston Deavers
           United States Magistrate Judge